UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| VIOLA WOODS, | } |
| | } |
| Plaintiff, | } |
| | } |
| vs. | }   CASE NO. CV 07-B-76-S |
| | } |
| R. JAMES NICHOLSON, Secretary, | } |
| United States Department of Veterans | } |
| Affairs, a federal agency, | } |
| | } |
| Defendant. | } |

## MEMORANDUM OPINION

This case is currently pending before the court on defendant R. James Nicholson, Secretary, United States Department of Veterans Affairs's ("the VA") Motion for Summary Judgment, (doc. 18).[1] In her Complaint, (doc. 1), plaintiff Viola Woods ("Woods"), an African-American female employed by the VA as an oncology dietician at its Birmingham, Alabama facility, alleges that the VA discriminated against her because of her race by 1) increasing her workload more than similarly-situated employees; 2) failing to compensate her for overtime work; and 3) eliminating her "compressed" schedule of eight nine-hour days and one eight-hour day in every two-week period. (Doc. 1 at ¶ 23.) Woods claims that these actions violated both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and section 1981 of the Civil Rights Act

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

of 1991 ("§ 1981"), 42 U.S.C. § 1981.² (*Id.* at ¶ 4.) The VA argues that Woods cannot establish a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting framework because the actions alleged do not constitute "adverse employment actions" and because Woods has not provided any valid comparators; alternatively, the VA contends that even if Woods can establish a *prima facie* case, she cannot rebut the VA's legitimate, non-discriminatory reasons for these actions with sufficient evidence of pretext.

Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the VA's Motion for Summary Judgment, (doc. 18), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56© of the Federal Rules of Civil Procedure ("the Federal Rules"), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©; *see also Celotex Corp. v. Catrett*, 477

---

² In its Answer, the VA denies all jurisdictional bases other than Title VII. (Doc. 6 at ¶ 4.) Because Woods sues the VA for its employment actions and thus sues a federal agency representative acting under color of federal law, Woods does not state a claim under § 1981 and can only sustain her suit under Title VII. *See Lee v. Hughes*, 145 F.3d 1272, 1277 (11th Cir. 1988) ("[T]he language of § 1981 is clear: Section 1981 provides a cause of action for individuals subjected to discrimination by private actors and discrimination under color of state law, but does not provide a cause of action for discrimination under color of federal law.")

U.S. 317, 322–23 (1986); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and that it is therefore entitled to judgment as a matter of law.  *See Celotex*, 477 U.S. at 323*; Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has met its burden, Rule 56(e) of the Federal Rules requires that the nonmoving party go beyond the pleadings and show that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324–25.  "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Waddell*, 276 F.3d at 1279; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Determining credibility, weighing evidence, and drawing legitimate inferences from the facts are all functions of the jury, *see id.* at 255; therefore, the court must accept as true all evidence favoring the nonmoving party and draw all justifiable inferences from the evidence in that party's favor.  Nevertheless, the nonmoving party need not be given the benefit of every inference but only of every *reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS[3]

The VA is a federal agency that has employed Woods as a registered dietician in the Nutrition and Food Service Department of the Birmingham VA Medical Center since 1986.  (Doc. 20-2, Woods Dep., at 8:3–5; Doc. 23-5, Woods's Employment Record.) Woods is an African-American female with a bachelor's degree in Foods and Nutrition Studies.  (Doc. 1 at ¶ 1; Doc. 23-5.)  Woods was promoted to her current position of Oncology Dietician, with a salary grade of GS-11/Step 8, sometime in the mid-1990s. (Doc. 20-2 at 26:13–15.)[4]  Since the early 1990s, Woods and the other dieticians on the VA's staff have been supervised by Denise Sockwell ("Sockwell"), a white female dietician who had served as the Clinical Nutrition Manager until her promotion to Chief of Nutrition and Food Service in November 2006.  (Doc. 20-3, Sockwell Dep., 25:7–27:4.)  Shortly after Sockwell first became Woods's supervisor, Woods filed an EEO complaint alleging a failure to promote, the resolution of which was Woods's promotion to the GS-11 Oncology Dietician position.  (Doc. 20-2 at 9:12–10:7.)

Prior to January 3, 2005, the date when Ruth McDaniel ("McDaniel"), a diabetic dietician, retired, both Woods and McDaniel worked in the VA's outpatient primary care

---

[3] As required when evaluating a motion for summary judgment, the Statement of Facts cites evidence and all reasonable inferences arising from it in the light most favorable to Woods, the nonmoving party.  *See, e.g.*, *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997), *citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citations omitted).

[4] The Complaint and Answer provide different dates for this promotion, (doc. 1 at ¶ 9; doc. 6 at 9), but Woods's deposition testimony, cited above, suggests that Woods was promoted in the mid-1990s.

and specialty clinics; Woods additionally covered some inpatient units. (*Id.* at 19:24–20:1; Doc. 20-3 at 73:20–78:4, 86:20–90:11; Doc. 20-4, Def.'s Responses to Pl.'s Interrogs. at ¶ 8.) Specifically, Woods's pre-2005 responsibilities included seeing patients in: the Blind Rehab Center, a unit in which patients stayed for about two months, but which in 2005 was designated as an outpatient clinic for the purpose of dietary consults; two of the inpatient medical wards, "Medical Team C" and "Medical Team D"; and the "red" primary care outpatient clinic. (Doc. 1 at ¶ 9; Doc. 20-2 at 35:11–25.) Woods was also required to sit on the VA's Patient Education and Cancer Committees and to conduct inspections of halfway houses for substance abuse, as well as cover for McDaniel whenever she was out. (Doc. 1 at ¶ 9; Doc. 20-2 at 24:21–25:2.) McDaniel, on the other hand, saw patients in the "blue" and "white" primary care outpatient clinics, the dialysis unit, the geriatric clinic, the diabetic clinic, and the cardiology clinic, and she also taught diabetes education classes three times per month and covered for Woods's outpatient duties whenever Woods was out, such as the every other Friday that Woods had off because of her compressed schedule. (Doc. 20-3, Sockwell Dep. 73:20–78:4; Doc. 20-2, Woods Dep., 24:21–25:2.) Sockwell and the dietetic technicians would handle Woods's inpatient duties when she was out. (Doc. 20-3, Woods Dep., 25:4–11.)

Following McDaniel's retirement, Sockwell re-assigned almost all of McDaniel's duties to Woods, despite the fact that there were two other registered dieticians under Sockwell's supervision: Jody Bilbrey ("Bilbrey") and Constance Prather ("Prather").

5

(Doc. 20-3 at 107:17–111:19, 117:9–15; Doc. 20-4 at ¶ 4.)  Sockwell did, however, re-assign Woods's Medical Team C duties, which comprised five to ten hours a week of work, to Bilbrey, (doc. 20-2 at 34:4–13; doc. 20-3 at 95:3–21, 112:14–18), and Sockwell herself took on Woods's Blind Rehab Center duties as well as all appointment scheduling duties, (doc. 20-3 at 115:23, 112:18–114:7).  Furthermore, Sockwell cancelled some of the clinic appointments for which Woods and McDaniel had been responsible prior to McDaniel's retirement.  (*Id.* at 109:23–110:9, 120:7–14; Doc. 20-5, Sockwell Sworn Statement, at 8–9.)  Sockwell did not reassign any of McDaniel's duties to Prather because Prather worked at a lower salary grade than McDaniel, so Sockwell believed she would have "an issue with the union" if she gave Prather any of McDaniel's duties.  (Doc. 20-3 at 202:5–205:19.)

   Woods began working late almost every day, from an additional hour to two hours per day, in order to complete her new set of responsibilities.  (Doc. 20-2 at 50:17–51:8.)  Woods informed Sockwell that she had been staying late but did not specifically request permission to work overtime, as department policy mandated, nor did Woods request any overtime compensation.  (*Id.* at 27:25–28:9, 51:9–21.)

   Woods took medical leave in April 2005, during which time Sockwell covered all of Woods's duties.  (Doc. 20-3 at 116:14–23.)  At some point that month, Sockwell informed Woods that, effective April 30, 2005, Woods would no longer be able to work the compressed schedule she had been given since 1995 and would have to return to a

regular work schedule of Monday through Friday, 8:00 a.m. to 4:30 p.m.  (*Id.* at 182:21–183:3.)  Sockwell cited the loss of clinical staff as the reason for Woods's schedule change, and in her deposition testimony, Sockwell read into the record the department's policy on compressed schedules: "Compressed work schedules may be approved for non-bargaining and bargaining unit employees on permanent tours provided as has been determined that no adverse impact on the admission of the Medical Center would result." (*Id.* at 181:14–23, 183:14–184:12.)  Prather, the only other dietician under Sockwell's supervision who worked a compressed schedule,[5] was allowed to remain on that schedule. (*Id.* at 185:11–186:3.)  In September 2005, after Woods had filed her EEOC complaint, Sockwell offered Woods the opportunity to discuss a new compressed schedule similar to Prather's, in which Woods would work on Saturdays, but Woods turned down the particular schedule offered.  (Doc. 20-6, Email from Sockwell to Woods; Doc. 20-3 at 186:22–189:10.)

**Alleged Comparators**

    **Bilbrey**

Bilbrey, a white female registered dietician, has worked for the VA since 1993 and has a master's degree in Nutritional Sciences.  (Doc. 1 at ¶ 12; Doc. 20-4 at ¶ 13; Doc. 23-4, Bilbrey's Employment Record.)  Her salary grade, like Woods, is GS-11.  (Doc. 20-2 at 26:13–17.)  Prior to McDaniel's retirement, Bilbrey worked solely with the inpatient

---

[5] Prather worked nine-hour days on Monday, Wednesday, Friday, and Saturday, and an eight-hour day every other Thursday.  (Doc. 20-3, Sockwell Dep., at 185:21–186:11.)

7

units, which included intensive care patients.[6]  (Doc. 20-3 at 134:5–135:5; 20-4 at ¶ 4.) Upon McDaniel's retirement, Bilbrey assumed Woods's Medical Team C duties.  (Doc. 20-3 at 112:15–18.)  Bilbrey was working a regular schedule at the time that Woods was taken off her compressed schedule.  (*Id.* at 185:11–14.)

### Prather

Prather, a white female registered dietician, was working at the VA longer than both Woods and Bilbrey, starting in 1982, and she has a master's degree in public health. (Doc. 1 at ¶ 12; Doc. 23-3, Prather's Employment Record.)  Her salary grade, however, remained at GS-10 until her retirement in 2006.[7]  (Doc. 20-2 at 22:15–20, 26:7–12; Doc. 20-3 at 165:23–166:1, 195:6–9.)  Neither Prather's duties nor her compressed schedule changed as a result of McDaniel's retirement: she continued to work primarily with home-based health care, requiring her to travel out of the office to patients' homes on most work days.  (Doc. 20-3 at 141:9–143:13, 185:21–186:3.)

### Sockwell

Sockwell, a white female registered dietician, supervised Woods, McDaniel, Bilbrey, and Prather, as well as fee basis dieticians in outlying clinics, and thus had

---

[6] Bilbrey also handled Total Parental Nutrition ("TPN") patients, a type of patient that Woods was not trained to handle, but Woods testified that there were not many TPN patients at the VA. (Doc. 20-2, Woods Dep., at 25:4–26:6, 38:17–39:6.)

[7] Sockwell testified that "a GS-10 requires a little bit more supervision than a GS-11." (Doc. 20-3 at 206:1–3.)  She also answered in the affirmative when asked at her deposition whether one of Prather's "problems" was that "for whatever reason, Ms. Prather didn't seem capable of conducting that and getting the patients seen within that slotted time." (*Id.* at 145:13–18.)

significant management responsibilities in addition to her patient consultations.  (Doc. 1 at ¶ 14; Doc. 20-2 at 26:22–27:4; Doc. 20-3 at 184:19–21.)  Both before and after McDaniel's retirement, Sockwell worked with Medical Teams A and B, performed nursing home inspections, and filled in for the dieticians she supervised where needed; after McDaniel's retirement, Sockwell took over Woods's Blind Rehab Center duties as well as all appointment scheduling for the outpatient clinics.  (Doc. 20-2 at 24:2–13; Doc. 20-3 at 52:20–22, 112:18–114:7; Doc. 20-4 at ¶ 5.)

### III. DISCUSSION

Title VII makes it an unlawful employment practice for an employer "to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).

Since Woods has not alleged any direct evidence of discrimination, Woods must use circumstantial evidence to prove her disparate treatment claims.  To evaluate circumstantial evidence under Title VII, the court employs the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Wilson v. B/E Aerospace*, 376 F.3d 1079, 1087 (11th Cir. 2004) (applying *McDonnell Douglas* to Title VII).  Under this framework, Woods must first prove a *prima facie* case, showing that she was a qualified member of a protected class and was subjected to an adverse employment

action in contrast with similarly-situated employees outside the protected class, in order to create an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767–68 (11th Cir. 2005); *Wilson*, 376 F.3d at 1087. If Woods can prove a *prima facie* case, the burden shifts to the VA to articulate one or more legitimate, non-discriminatory reasons for its employment action. *See Burdine*, 450 U.S. 248, 253 (1981). If the VA meets this burden of production, the burden shifts back to Woods to prove by a preponderance of the evidence that the VA's alleged reason or reasons were a pretext for illegal discrimination. *See id.*; *Wilson*, 376 F.3d at 1087.

**A. *Prima Facie* Case**

The VA does not dispute that Woods is an African-American and is therefore a qualified member of a protected class. The VA also does not dispute that, to the extent that Bilbrey, Prather, and Sockwell are similarly situated to Woods, they fall outside the protected class. The VA does argue, however, that Woods cannot prove a *prima facie* case of discrimination under Title VII because she has not established any adverse employment actions or proper comparators.

**1. Adverse Employment Actions**

The Eleventh Circuit has defined an adverse employment action within the meaning of Title VII as:

> an *ultimate employment decision*, such as discharge or failure to hire, or other conduct that alters the employee's

>compensation, terms, conditions, or privileges of employment, deprive him or her or employment opportunities or adversely affect his or her status as an employee . . . . The question of whether an employee has suffered a materially adverse employment action will normally depend on the facts of each individual case.

*Bass v. Bd. of Cty. Comm'rs of Orange Cty., Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001) (emphasis added). The VA contends that increasing Woods's duties, failing to compensate Woods for overtime work, and eliminating Woods's compressed schedule are not actions that rise to the level of "adverse employment actions." (Doc. 19 at 21–22.)

Taking the second alleged action first, the court agrees with the VA that any alleged failure to compensate Woods for overtime work is not an adverse employment action, since Woods does not complain of any specific *decision* that was made by her supervisors with respect to her compensation. There is no indication that Woods was required to work overtime in order to maintain her status as an employee in good standing, or to have access to other employment opportunities. Moreover, Woods merely mentioned her late hours to Sockwell and did not request overtime compensation, so Woods did not even give the VA any chance to reach a decision, adverse or otherwise, regarding her compensation. Thus, the court finds that any failure to pay Woods for overtime is not an adverse employment action within the meaning of Title VII.

With respect to the two other alleged adverse actions, however, the court acknowledges that Woods's additional workload and changed schedule could be adverse employment actions to a reasonable employee in Woods's circumstances; that is, they are

employment decisions that would adversely change the conditions of Woods's employment by giving her more work to complete in a less personally preferable schedule than she had previously worked. While there is no question that Woods's compressed schedule was eliminated and that the number of clinics for which Woods was responsible increased after McDaniel's retirement, the court finds it difficult to determine from the record exactly how much Woods's workload increased as a result of these new duties and to compare Woods's workload to those of her alleged comparators, particularly Bilbrey and Sockwell, who also assumed additional responsibilities upon McDaniel's departure. The court notes that Woods has submitted two documents to establish the relative size of each of the dietician's workloads: a report entitled "Dietetic Encounter Statistics," and a spreadsheet depicting the average number of patients per day that each dietician saw from August 2004 to February 2005. (Doc. 23-7; Doc. 23-8.)   As defendant points out in its reply brief, plaintiff did not offer testimony explaining the meaning or significance of the numbers contained in these documents. However, for purposes of summary judgment the court will assume that plaintiff has established the adverse action prong of her summary judgment case with regard to her changed work schedule.

**2. Comparators**

The VA objects to Woods's use of Bilbrey, Prather, and Sockwell as comparators for different reasons: the VA observes that Sockwell was a supervisor, whereas the others

were all non-supervisory employees[8]; that Bilbrey worked exclusively with inpatients, as opposed to Woods, who worked with both inpatients and outpatients; and that Prather was at a lower salary grade and also worked exclusively with home-based patients, and thus was not at the hospital to work with inpatients or hospital-based outpatients. (Doc. 19 at 23; Doc. 24 at 7–8.) If the VA is correct that there are no valid comparators, Woods could not establish a *prima facie* case because she could not show that there were similarly-situated employees outside of the protected class who were treated more favorably than Woods. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.") (emphasis omitted).

The Eleventh Circuit has explained that: "[t]o show that employees are similarly situated, the plaintiff must show that the employees are similarly situated in all relevant respects . . . ." *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (internal quotation marks omitted). "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson,* 376 F.3d at 1091. The key inquiry is whether an employer subjected the employees to different employment policies, not whether the employees share the same job title. *See Lathem v. Dep't of Children and Youth Servs.*, 172 F.3d 786, 793

---

[8] The VA did not address Sockwell as a potential comparator until its reply to Woods's opposition to the motion for summary judgment, likely because Woods's complaint implied that there were only three relevant dieticians on staff, Woods, Bilbrey, and Prather, (doc. 1 at ¶ 12), so that Woods was not comparing herself to Sockwell.

13

(11th Cir. 1999). As Woods herself points out in her opposition to the motion to dismiss, a Sixth Circuit case has also found relevant to the determination of comparators whether the employees share the same supervisor. *See Mitchell v. Toledo Hosp.*, 864 F.2d 577, 583 (6th Cir. 1992).

The court deems Bilbrey and Prather to be proper comparators to Woods because all three were dieticians working at the VA under Sockwell's supervision, with the similar job duty of counseling patients on diet and nutrition. To be sure, each dietician specialized in different patient populations (inpatients for Bilbrey, home-based patients for Prather, and both inpatients and outpatients for Woods), but this distinction is not sufficient to render Bilbrey, Prather, and Woods differently situated within the meaning of Title VII, particularly since they were all registered dieticians and capable of treating any of the VA patients. In addition, since Sockwell did, in fact, reassign duties among the dieticians upon McDaniel's retirement, that very reassignment demonstrates that the dieticians working under Sockwell were subject to the same employment policies.

Sockwell, on the other hand, is not a proper comparator since she herself is the other dieticians' supervisor, and therefore does not share the same supervisor as the rest. In any case, with at least two valid comparators successfully shown, who were outside the protected class and who were treated more favorably than Woods with respect to the adverse employment actions, and assuming for purposes of summary judgment that plaintiff established adverse action, Woods has met all elements of a *prima facie* case.

**B. Legitimate, Non-Discriminatory Reasons**

Woods concedes that the VA has articulated legitimate, non-discriminatory reasons for the adverse employment actions. (Doc. 23 at 20.) Specifically, the VA has presented the following explanation for Sockwell's decision to shift almost all of McDaniel's duties to Woods rather than to Bilbrey or Prather:

> The reasons that Plaintiff rather than Ms. Prather was assigned Ms. McDaniel's duties were that Ms. Prather had never or rarely handled outpatient clinic duties; was frequently out of the hospital performing her home health duties; worked on Saturday when outpatients were not scheduled, and was thus off on at least one day during the week when outpatients were scheduled; was not as efficient as Plaintiff in handling outpatient clinic duties; and was at a lower grade level than Plaintiff. The reasons Plaintiff rather than Ms. Bilbrey was assigned Ms. McDaniel's duties were that Ms. Bilbrey handled inpatients and all intensive care unit patients and no one could have covered Ms. Bilbrey's inpatient duties. Plaintiff on the other hand, had been performing the same or similar outpatient duties as Ms. McDaniel, and Ms. McDaniel's patients could be scheduled during Plaintiff's outpatient clinic hours.

(Doc. 20-4 at ¶ 4.) The VA has also attributed Sockwell's decision to eliminate only Woods's compressed schedule, and not Prather's, to the fact that Woods worked in the outpatient clinics, where the department became short-staffed after McDaniel's retirement, and to the fact that Prather was not at the GS-11 salary level for which the outpatient clinical jobs were graded. (Doc. 19 at 19.) The VA's articulated reasons for the previously-established adverse employment actions — Woods's increased workload

15

and changed schedule — are sufficiently legitimate and non-discriminatory to meet the VA's burden of production.

**C. Pretext**

Woods offers the following conclusions to prove that the VA's legitimate, non-discriminatory reasons were a pretext for unlawful discrimination: 1) that both Bilbrey and Prather had the same qualifications as Woods, but Woods received a disproportionate share of McDaniel's duties upon her retirement; 2) that Sockwell admitted that she never actually spoke with the union about the possibility of Prather working some GS-11-rated duties, but just assumed the union would have a problem; 3) that Prather was able to retain her compressed schedule, despite the alleged short-staffing; 4) that Sockwell offered Woods an alternative compressed schedule in September 2005, implying that it was unnecessary to place Woods on a regular schedule in the first place; 5) that Sockwell refused to provide Woods with secretarial and dietetic technician assistance; 6) that Sockwell designated certain inpatients being discharged as "outpatients" in order to move them to Woods's outpatient clinics; and 7) that the "consistent" pattern of Sockwell's racial discrimination, as evidenced by Woods's first EEO complaint about her promotion, Sockwell's "bogus" offer of an alternative compressed schedule, and the fact that all three of the African-American employees that Sockwell has hired during her employment at the VA were hired after Woods's present EEO complaints. (Doc. 23 at 23–26.)

Woods's first four arguments hold the greatest potential for establishing pretext, while the rest are clearly without merit. The fifth argument, that Sockwell refused to provide Woods with additional assistance, is successfully refuted by Sockwell's testimony that the VA's dietetic technician, Hesterine Brand, retired in March 2005, so thereafter none of the dieticians had access to a technician. (Doc. 20-3 at 51:6–11.) Likewise, Sockwell has testified that the dietician staff did not have a clerk or a secretary during the relevant time period. (*Id.* at 114:8–15.) As a result, there was no assistance available that Sockwell could have refused to offer Woods; moreover, there was no assistance that Sockwell offered to the *other* dieticians that she did not also offer to Woods. In response to the sixth argument, that Sockwell designated certain inpatients as "outpatients" in order to move them to Woods's clinics, is countered by Sockwell's explanation that the hospital had implemented a new performance measure regarding dietary instruction for discharged cardiac patients, and that Sockwell decided that those patients would best be served by scheduling appointments with the outpatient clinic, where Woods happened to be the only dietician. (Doc. 20-3 at 173:16–179:9.) The seventh and final argument, alleging a pattern of discrimination, relies on a 13-year-old EEO charge as well as recent hiring practices that the court does not find to be admissible evidence of pretext.

With her initial four arguments, Woods essentially maintains that there is sufficient circumstantial evidence of discrimination through the actions that Sockwell, as Woods's and the comparators' supervisor, decided *not* to take; namely, that Sockwell refused to

17

distribute McDaniel's prior duties evenly among the three registered dieticians she supervised, and that she refused to let Woods continue to work her compressed schedule, in order to discriminate against Woods for her race, and, in Woods's view, to make the work environment so unpleasant that Woods would be forced to quit. Because Woods's sole method for establishing pretext is to discredit Sockwell, Woods must produce evidence on which a reasonable jury could find that Sockwell's explanations that Woods was the best-suited dietician to take over McDaniel's outpatient duties, and that the staffing needs of the hospital required Woods to be taken off her compressed schedule, were pretext for unlawful discrimination based on the plaintiff's race. The court finds that Woods has not met her burden of persuasion.

As noted above Sockwell testified that, because Woods and McDaniel shared similar patient populations, it was most efficient to shift nearly all of McDaniel's responsibilities to Woods, to shift some of Woods's inpatient duties to Bilbrey, and to shift some of Woods's other duties to Sockwell. Sockwell decided that Prather's home health duties made it difficult for Prather to take on any significant hospital-based responsibilities, and that Prather did not need to give up her compressed schedule in order to accommodate the loss of staff in the outpatient clinics.

Plaintiff has not offered evidence on which a reasonable jury could find that Sockwell's legitimate non-discriminatory reasons are pretext for unlawful discrimination

based on the plaintiff's race and defendant is therefore entitled to judgment as a matter of law.

## IV. CONCLUSION

Based on the foregoing, the court is of the opinion that even assuming Woods established a *prima facie* case of discrimination, she has not put forth evidence on which a reasonable jury could find that the VA's legitimate, non-discriminatory reasons for its alleged adverse employment actions were a pretext for unlawful discrimination, rather than the articulated result of short-staffing, particularly in outpatient care, following one dietician's retirement. Consequently, the court finds that there is no genuine issue of material fact and that the VA is entitled to summary judgment on both Woods's Title VII and § 1981 claims. An Order granting the defendant's Motion for Summary Judgment, (doc. 18), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 29th day of September, 2008.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE